In the Matter of the Application of THE LONG ISLAND RAILROAD COMPANY et al., Appellants, for the Construction of an Electric Railroad on Portions of Atlantic Avenue, in the Borough of Brooklyn, City of New York.

MARY E. CAMPBELL et al., Respondents.

1. BROOKLYN (CITY OF) — RIGHTS OF COMPANY OPERATING RAILROAD IN ATLANTIC AVENUE (L. 1853, CH. 220; L. 1855, CH. 475) — COMPANY HAS PERPETUAL EASEMENT, OR RIGHT OF WAY, NOT TITLE IN FEE, TO STRIP USED FOR RAILROAD PURPOSES. Where the only rights which a railroad company and its lessee, have in Atlantic avenue, in the

city of Brooklyn, are those existing under an agreement, authorized by statute (L. 1853, ch. 220), between the predecessors of said companies and the city of Brooklyn creating Atlantic avenue as it is now laid out, by which it was provided that the railroad companies should have the exclusive and permanent right to use a strip of land through the center of said avenue, when acquired by the city, for railroad purposes, which agreement was ratified and confirmed by a subsequent statute (L. 1855, ch. 475), which also provided that the city should hold title to the strip "in fee simple absolute, subject only to the terms of the agreement and the provisions of" the statute, and there was nothing in the statute which provided in terms what title the railroad companies should take to the strip, they did not acquire a title in fee thereto, but only a perpetual easement or right of way over such strip for railroad purposes, since the rights, powers and privileges granted to the companies were in derogation of common right, and included no privilege except those expressly authorized, or such as were necessary to accomplish the general purpose of the legislature.

2. SAME — AWARD OF DAMAGES TO PROPERTY OWNERS FOR USE OF STRIP FOR RAILROAD PURPOSES DID NOT VEST TITLE TO STRIP IN RAILROAD COMPANY. The contention that the proceedings for the opening of Atlantic avenue east of Franklin street vested in the railroad companies the fee of the thirty-foot strip is not supported by the fact that the commissioners were bound to include, and are presumed to have included, in their award to parties whose land was taken, all damages to the abutting premises caused by the use of the "thirty-foot" strip for the railroad purposes in contemplation, since an appraisal of such damages was required whether a fee or an easement was to be given to the railroads, and whether the use was for both highway and railroad purposes or railroad purposes only.

3. SAME — REMOVAL OF STEAM RAILROAD FROM SURFACE OF ATLANTIC AVENUE BY PUTTING IT BELOW OR ABOVE LEVEL OF THE STREET — COMPANY NOT AUTHORIZED TO CONSTRUCT AND OPERATE TROLLEY RAILROAD ON STRIP ABOVE OR BELOW STEAM RAILROAD — UNCONSTITUTIONALITY OF STATUTES RELATING THERETO (L. 1897, CH. 499; L. 1899, CH. 497). The steam railroad tracks formerly maintained and operated over said strip having been removed, under the command of the Atlantic Avenue Improvement Act (L. 1897, ch. 499), from the surface of the street and put below or above the level of the avenue so as to leave it "unobstructed on the surface and open to the free passage of pedestrians and vehicles," the railroad companies, owning the right of way in said strip, are not authorized — under the provisions of that act and the statute (L. 1899, ch. 497), which provides that whenever the tracks of any steam railroad have been placed below or above the level of a street by requirement of law, "such alteration or change of grade shall not be deemed to curtail or affect any right which such railroad company

or its lessees or assigns may have to maintain and operate a surface passenger railway within the limits of the right of way so depressed or elevated, and over and under the railroad tracks so depressed or elevated, with all turnouts, sidings and tracks necessary to secure the continuous connection and operation of such surface railroad " — to construct or operate a street surface railroad upon the surface of the strip from which the steam railroad has been removed without the consent of the abutting property owners and the local authorities having charge of the street, since such an interpretation of the statutes would permit the construction and operation of two railroads in Atlantic avenue, where only one existed before, one an underground or overhead railroad, the other a street surface railroad, and the legislature had no power to authorize the construction of the latter, since it is restrained by the Constitution from authorizing the construction or operation of street railroads, even by general laws, except upon the condition that the consents required by the Constitution (N. Y. Const. art. 3) be first obtained.

*Matter of Long Island R. R. Co.*, 116 App. Div. 928, affirmed.

(Argued October 7, 1907; decided November 1, 1907.)

APPEAL from an order of the Appellate Division of the Supreme Court in the second judicial department, entered January 31, 1907, which denied an application of the appellants herein for the appointment of commissioners to determine whether certain railroad tracks should be constructed and operated on Atlantic avenue in the borough of Brooklyn, city of New York.

Atlantic avenue is a street one hundred and twenty feet wide, running from the East river easterly to the present limits of the borough of Brooklyn, about seven miles easterly of the old city line. At the junction of Atlantic and Flatbush avenues a steam railroad, owned by the Nassau Electric Railroad Company but leased and operated by the Long Island Railroad Company, commences and extending through Atlantic avenue continues on to Jamaica. Prior to 1897 the railroad was on the surface of the avenue, but after the passage of the Atlantic Avenue Improvement Act in that year (L. 1897, ch. 499), the tracks were placed partially in a subway and partially upon an elevated structure connected at three points by inclined planes resting on abutments of masonry, the existence of which makes it impossible to operate a sur-

face road without encroaching upon the roadway of Atlantic avenue on either side of the abutment.

The westerly part of the present right of way of the railroad companies originally belonged to the Brooklyn and Jamaica Railroad Company which was organized by special charter in 1832. (L. 1832, ch. 256.) After the road was built it was leased under authority conferred by chapter 94 of the Laws of 1836 to the Long Island Railroad Company, which had been incorporated in 1834. (L. 1834, ch. 178.) The right to alter, modify or repeal each of the three acts last named was expressly reserved by the legislature. The rights of the Brooklyn and Jamaica Railroad Company passed through foreclosure proceedings to the Atlantic Avenue Railroad Company, and from the latter to the Nassau Electric Railroad Company, one of the appellants. After the foreclosure a new lease was given to the Long Island Railroad Company. .

Prior to 1850 Atlantic street was opened from Flatbush avenue to Bedford avenue and a portion of the right of way of the Brooklyn and Jamaica Railroad Company was taken for the purpose. From Franklin avenue eastward no portion of the railroad property or right of way was touched. The original right of way of the Brooklyn and Jamaica Railroad Company went over Atlantic street, and easterly of Flatbush avenue, over the present Atlantic avenue until it reached a point in the neighborhood of Franklin avenue, where it passed northward on a right of way about fifty feet wide, practically parallel to Atlantic avenue, extending to the city line as it formerly existed. This right of way, easterly of Franklin avenue and in front of the property of the respondents, was about one hundred feet north of the present northerly line of Atlantic avenue, which at this point was at one time known as Schuyler street. In 1855 a tripartite agreement was made between the two railroads first above mentioned and the city of Brooklyn, the first division of which relates to that part of Atlantic avenue which lies west of Franklin avenue, and the second, referred to in the opinion, to that part extending from the westerly line of Franklin

avenue to the easterly line of the city as it existed at the date of the agreement. Atlantic avenue, as distinguished from Atlantic street and Schuyler street, was created by the tripartite agreement and an act of the legislature confirming the same, known as chapter 475 of the Laws of 1855.

In 1897 the Atlantic Avenue Improvement Act was passed (L. 1897, ch. 499), under which the steam railroad tracks were removed from the surface of Atlantic avenue and placed partially underground and partially overhead. Under the act last named and an act passed in 1899 (L. 1899, ch. 497) the petitioning railroads claim the right to construct and operate a trolley line on the surface of Atlantic avenue where the steam railroad formerly stood. Such line has already been constructed except as to certain turnouts and sidings. This proceeding was commenced by an application made by the railroad companies to the Appellate Division for the appointment of commissioners to determine whether the necessary turnouts and sidings should be constructed to enable the trolley line to pass around the three structures by which the tracks laid beneath the surface of Atlantic avenue are carried over an inclined plane to the elevated road built above the surface thereof. The application was denied and the petitioning railroads appeal.

*George W. Wingate* for appellants. The Brooklyn and Jamaica Railway Company and the Long Island Railroad Company as its lessee possessed the right to use the strip eighty feet wide which constituted their original right of way between Gowanus lane (*i. e.*, Flatbush avenue) and Classon avenue, together with the strip fifty feet wide constituting the continuation of such original right of way and running between the blocks from Classon avenue to the city line for the operation of either a surface, underground or elevated railroad structure or for all of them, whenever such railroad should reasonably consider such use to be necessary, and to operate cars over any or all of such railroads by either steam or electricity. (*People* v. *B., F. & C. I. R. R. Co.*, 89 N. Y.

75 ; *Beekman* v. *B. & B. R. R. Co.*, 89 Hun, 14 ; *Galla-gher* v. *Keating*, 27 Misc. Rep. 132 ; 57 App. Div. 626 ; 171 N. Y. 657 ; *Bennett* v. *L. I. R. R. Co.*, 181 N. Y., 431.) There is no foundation for the contention of the respondents that the proposed trolley surface railroad is a new railroad. On the contrary, it is an existing right in respect to the portion which is upon its right of way which is entered under the act of 1899 to ask for a franchise for so much of the three turnouts in question as shall be upon the highway. (L. 1899, ch. 497.) The proceedings for the opening of Atlantic avenue east of Franklin vested in the railroad the fee of the strip thirty feet wide, which was taken in those proceedings not for street purposes, but for railroad uses. (*S. B. Ry. Co.* v. *Kirk-over*, 176 N. Y. 301 ; *Matter of N. Y. C. R. R. Co.*, 15 Hun, 63 ; *Rood* v. *N. Y. & E. R. R. Co.*, 18 Barb. 80 ; *Conklin* v. *N. Y., O. & W. R. R. Co.*, 102 N. Y. 107 ; *Bennett* v. *L. I. R. R. Co.*, 181 N. Y. 431 ; *Larney* v. *N. Y. & H. R. R. Co.*, 62 App. Div. 311 ; *Cassidy* v. *O. C. R. R. Co.*, 141 Mass. 174 ; *Moss* v. *St. L. R. R. Co.*, 85 Mo. 86 ; *C. & R. I. R. R. Co.* v. *Smith*, 29 Am. & Eng. R. R. Cas. 558 ; *Mott* v. *Eno*, 181 N. Y. 346.) It was not the intention of the tripartite agreement and confirmatory act to limit the railroad use of the thirty-foot strip in any other respect than as to speed rate of trains. (*Gillet* v. *Bank of America*, 160 N. Y. 549 ; *Wright* v. *Reusens*, 133 N. Y. 298, 305 ; *Smith* v. *Molleson*, 148 N. Y. 241, 248 ; *Wells* v. *Alexandre*, 130 N. Y. 642, 645 ; *Schoellkopf* v. *Coatsworth*, 166 N. Y. 77, 84 ; *Knowles* v. *Toone*, 96 N. Y. 534 ; *Lang-don* v. *Mayor, etc.*, 93 N. Y. 129 ; *Bluckman* v. *Striker*, 142 N. Y. 555 ; *Bennett* v. *L. I. R. R. Co.*, 181 N. Y. 431 ; *De Witt* v. *E. T. R. Co.*, 134 N. Y. 495.) If there was any doubt as to whether the Atlantic Avenue Improvement Act interfered with the right of the petitioners to construct the proposed trolley line, it was removed by the act of 1899. (L. 1899, ch. 497.) The act of 1899 is not unconstitutional. (*G. El. R. R. Co.* v. *Anderson*, 3 Abb. [N. C.] 434 ; *People* v. *L. I. R. R. Co.*, 9 Abb. [N. C.] 181 ; *Matter of T. F. St.*

28

*R. R. Co.*, 102 N. Y. 348; *People ex rel.* v. *Darston*, 119 N. Y. 569; *Sweet* v. *City of Syracuse*, 129 N. Y. 316; *People ex rel.* v. *Rice*, 135 N. Y. 484; *Clark* v. *State*, 142 N. Y. 101; *Frees* v. *Ford*, 6 N. Y. 176; *People* v. *Crissey*, 91 N. Y. 616; *People* v. *Brooklyn*, 89 N. Y. 75; *People* v. *Budd*, 117 N. Y. 13.)

*Adrian T. Kiernan* and *William H. Good* for Mary E. Campbell et al., respondents. Neither the Brooklyn and Jamaica Railroad Company nor the Atlantic Avenue Railroad Company nor the Long Island Railroad Company ever acquired any fee to the thirty-foot right of way in Atlantic avenue, in front of the premises of the objectors. (L. 1853, ch. 220; L. 1897, ch. 499; L. 1855, ch. 457; *Leffman* v. *L. I. R. R. Co.*, 47 Misc. Rep. 169.) The Brooklyn and Jamaica Railroad Company had only the right to operate a single or double-tracked railroad. It never had and has not now the right to maintain either a four-tracked railroad or two double-tracked railroads. The legislature had the power to regulate and control the operation of the railroad of the Atlantic Avenue Railroad Company (successor of the Brooklyn and Jamaica Railroad Company) and of its lessee, the Long Island Railroad Company. It exercised this power when, by chapter 499 of the Laws of 1897, it changed the grade of the railroad then operated by the Long Island Railroad Company, as the lessee of the Atlantic Avenue Railroad Company. It did not create any right to maintain any other or new or additional railroad, nor did it give the right to maintain a four-tracked railroad. (*Mayor, etc.*, v. *T. T. S. R. R. Co.*, 113 N. Y. 316; *People* v. *B. & A. R. R. Co.*, 70 N. Y. 570; *People* v. *Budd*, 117 N. Y. 111; *C., B. & Q. Ry. Co.* v. *Illinois*, 200 U. S. 561; *W., etc., R. R. Co.* v. *Jacobson*, 179 U. S. 296; *People* v. *G. W., etc., T. Co.*, 112 App. Div. 581; *N. Y. & N. E. R. R. Co.* v. *Bristol*, 151 U. S. 570.) Chapter 497 of the Laws of 1899 does not presume to give any additional rights to construct a new railroad; it simply provides that where the grade of a railroad is changed, as is done under the act of 1897, such

change of grade shall not affect the rights which the railroad company or its lessees may have, if any at all, to maintain and operate a surface passenger railway on the old right of way. (*Matter of Sugden* v. *Partridge*, 174 N. Y. 95; *Matter of T. A. R. R. Co.*, 121 N. Y. 541; *Matter of M. T. Co.*, 111 N. Y. 603.) The applicant companies not having shown that they have any rights to operate a street surface railroad on Atlantic avenue, their application for the appointment of commissioners was properly denied. (*Leffman* v. *L. I. R. R. Co.*, 47 Misc. Rep. 169.)

*Robert Stewart* and *C. Augustus Haviland* for Brooklyn Trust Company et al., respondents. Neither of these petitioning railroads can maintain this proceeding. By the improvement of Atlantic avenue no right of either the Nassau Electric Railroad Company nor of the Long Island Railroad Company to maintain or operate a surface passenger railway upon Atlantic avenue was curtailed or affected within the meaning and intent of chapter 497 of the Laws of 1899. (L. 1899, ch. 497; L. 1855, ch. 475; L. 1860, ch. 460.) Chapter 497 of the Laws of 1899 is unconstitutional and void. (Const. of N. Y. art. 3, § 18; *People* v. *Allen*, 42 N. Y. 404; *People* v. *Albertson*, 55 N. Y. 50; *People* v. *Comr. of Highways*, 53 Barb. 70.)

*Charles B. Hobbs* for Clarence W. Seamans, respondent.

*Walter E. Warner* for Annie Kennedy et al., respondents.

VANN, J. The project of the petitioning railroads was resisted by landowners whose premises abut upon that part of Atlantic avenue which lies substantially between Bedford and Nostrand avenues. The original right of way of the appellants never covered any part of Atlantic avenue in front of the lands of the respondents. In that locality all the rights which the railroad companies ever had to the so-called "thirty-foot strip," which embraces their present right of way, came through a tripartite agreement, dated April 10,

1855, executed by the Brooklyn and Jamaica Railroad Company, as party of the first part, the Long Island Railroad Company as party of the second part, and the City of Brooklyn as party of the third part. That instrument provided for making an avenue 120 feet wide, from Flatbush avenue to the city line, out of portions of the old Atlantic street; the railroad strip west of Classon avenue; the proposed but unopened Schuyler street, and additional land to be condemned by the city on the north side, east of Classon avenue. It contains many mutual stipulations, and, among others, the following: The parties of the first and second parts agreed to convey to the party of the third part, if authorized by the legislature, " the strip of land fifty feet in width now owned by the party of the first part and occupied by the railroad tracks, extending from the westerly side of Franklin avenue to the easterly line of the present city limits, provided, however, and upon this express condition, that the parties of the first and second part shall forever have the exclusive right to use and occupy a strip or space of the width of thirty feet in the center of said Atlantic Avenue as so extended and in the center of Schuyler Street, as thus widened, from the intersection of Atlantic Avenue to the easterly line of the city as thus widened, for the purpose of railroad tracks and turnouts and the running of locomotives and cars thereon without interruption or molestation." Upon " the cession and conveyance " aforesaid and when Atlantic avenue should have been laid out and graded, the party of the second part agreed " to remove the rails from the strip of land so to be ceded and to lay the necessary tracks in that portion of Atlantic Avenue so extended and in Schuyler Street as so widened." No part of the agreement was to be binding upon any party until the Legislature authorized the three corpora, tions to carry it into effect. Adequate authority was given by chapter 475 of the Laws of 1855, by which the tripartite agreement was " ratified and confirmed, together with all the clauses and covenants therein contained."

The statute further provided that the city should hold the strip of land to be conveyed to it " in fee simple absolute,

subject only to the terms of such agreement and the provisions of " the act.   Chapter 220 of the Laws of 1853, which led to the tripartite agreement, was repealed " so far as the same is inconsistent with this present act   *   *   *   and," as the statute continued, " after the said avenue and street shall be actually laid out, extended and widened, as hereinbefore provided, and the report of said commissioners finally confirmed, the street now known as Atlantic Street in said city, together with said avenue as so extended, and Schuyler Street as so widened, shall be known and distinguished by the name of Atlantic Avenue."

There was nothing in the act which provided in terms what title the railroad company should take to the " thirty-foot" strip, not yet acquired but which was to be acquired by the city and which the company was to have the exclusive and permanent right to use and occupy for railroad purposes, not by way of reservation, but by grant or license from the city.

The companies and the city complied with the provisions of this agreement, and the object of the various acts and instruments was thus accomplished.   All the land east of Classon avenue, which, for a distance of about five miles and for the entire width of 120 feet, was converted into an extension of Atlantic avenue, was at the date of the agreement farming lands, owned by private individuals.   This land was acquired by the city by purchase and condemnation pursuant to the statute, including the lands in front of the abutting owners, who now resist the application of the companies and whose rights alone are involved in the present controversy.

The final result was a grand avenue, 120 feet wide, with a " thirty-foot" strip in the center for the use of the railroads, and a driveway forty five feet in width on either side thereof for the use of the public generally.

It is apparent from reading the tripartite agreement in connection with the act of 1855, that it was the intention of the legislature to confer upon the corporations concerned adequate power to part with and acquire such property rights

as were necessary to carry into effect the scheme in contemplation. The land was appropriated by the state to a public use, with the right on the part of both city and railroad to take and hold such interests as the legislature deemed necessary to effect the widening and extension of Atlantic avenue. The powers granted to the railroad companies, however, were in derogation of common right and according to the settled rule in such cases, included no privilege except those expressly authorized, or such as were necessary to accomplish the general purpose of the legislature. That purpose was to widen and extend Atlantic avenue by, among other things, appropriating land for the benefit of the city and permitting the city to give the railroad companies and the latter to accept a right of way over a part. thereof, in accordance with an agreement already made between them, supported by a full consideration. The companies did not need the fee to the "thirty-foot" strip. A perpetual easement or right of way was all that was necessary to satisfy every use then in view. The rule of limitation already mentioned, therefore, would confine the title to an easement unless the language of the legislature, which adopts the words of the tripartite agreement, clearly calls for a fee. "A doubt as to the extent of the power, after all reasonable intendments in its favor  *  *  * should be solved adversely to the claim of power." (*Matter of N. Y. & Harlem R. R. Co.* v. *Kip,* 46 N. Y. 546, 552.) The language of the contract, carried forward into the statute, gives to the railroad companies "the exclusive right to use and occupy the thirty-foot strip forever for the purpose of railroad tracks and turnouts and running locomotives and cars thereon without interruption or molestation." This does not "clearly" describe a title in fee, but with greater clearness describes an easement, which was all the railroads needed, and according to the principle of strict interpretation governing the subject, was all they took. The legislature did not intend to create nor permit the parties interested to create two streets named Atlantic avenue, each forty-five feet wide, separated by a parcel of land belonging to the rail-

road companies in fee and forming no part of the public highway. The intention of both contract and statute was to create a noble avenue 120 feet wide, subject to an easement for railroad purposes over the central portion. Such land as was to be acquired by the city from individual owners and incorporated into the avenue, including all that upon which the lands of the respondents abut, was not to be acquired for railroad purposes, but for highway purposes; and when acquired it was by virtue of the tripartite agreement and the statute made subject to a right of way over a part thereof for the use of the railroads. While it is true that the commissioners appointed in the proceeding to open Atlantic avenue east of Franklin street were bound to include and are presumed to have included in their award to parties whose land was taken, all damages to the abutting premises caused by the use of the "thirty-foot" strip for the railroad purposes in contemplation, still an appraisal of such damages was required whether a fee or an easement was to be given to the railroads, and whether the use was for both highway and railroad purposes or railroad purposes only. The anomaly of a statute authorizing a city to condemn land solely for railroad purposes, or for the exclusive purpose of conveying it to a railroad company in fee, is avoided by the more reasonable construction that the city was authorized to condemn for highway purposes, with the statutory as well as contractual obligation to give the railroad company a right of way for its railroad. The legislature authorized the appropriation of land in order to widen and extend a street, not to change the location of a railroad. A street purpose was its primary object in taking the land, and the railroad purpose was secondary and incidental. This accords with the title of the act in question, "authorizing the common council of the city of Brooklyn to widen and extend Atlantic Avenue and to widen Schuyler Street in the city of Brooklyn, and to ratify and confirm an agreement therein mentioned between the said city and the Long Island Railroad Company and the Brooklyn and Jamaica Railroad Company."

The title that the railroads took to the "thirty-foot" strip west of Bedford avenue rests upon facts differing from those governing the subject east of that avenue and that question is not directly before us.

Atlantic avenue, as thus widened and extended, has existed for more than forty years, but during most of that period it has had an uneasy history. Legislation of various kinds has rested upon it like a shadow. The right of the railroads to use steam as a motive power was first suspended and then restored. (L. 1859, ch. 484; L. 1876, ch. 187.) Substantial iron fences to shut the "thirty-foot" strip off from the rest of the avenue were at one time required, as well as gates at many of the street crossings. Owing to the extension of the city and the enormous increase in its population the railroad was no longer welcome in the center of the avenue and there was much opposition to steam as the motive power after its use was restored. All parties seem to concede that, as the result of years of agitation, an act was passed in 1896 "to authorize the appointment of a commission to examine into and report a plan for the relief and improvement of Atlantic Avenue in the city of Brooklyn." (L. 1896, ch. 394.) This act required five commissioners, when appointed by the mayor, to "inquire into the condition of Atlantic Avenue in said city with reference to the railroads operated thereon," and to "formulate a plan for the relief of said avenue and the improvement of the same." The plan was to be reported to the mayor who was required to "cause a bill to be prepared to carry out said plans and recommendations and" to "present the same to the legislature at its meeting in the year 1897."

This was followed the next year by a statute known as the Atlantic Avenue Improvement Act (L. 1897, ch. 499). The primary command of this act was to so change the grade of the railroad tracks on the "thirty-foot" strip as to elevate and depress the same so that they should no longer rest on the surface of the street. This was to be done by depressing the grade in some places "so that the existing surface railroad tracks shall be below the surface of Atlantic Avenue at such

depth as to allow the complete restoration of the surface of said Atlantic Avenue, free from steam railroad tracks, fences, gates, signal posts or other appurtenances of such steam railroad now existing thereon." In other places "the said right of way and railroad tracks" were to be "used and operated in an open cut, with proper retaining walls and of width not greater than the present right of way in possession of said railroad companies, the grade of said tracks and right of way rising gradually until they reach" a point named and from that point "the said railroad tracks shall be removed from the surface as now operated, and raised by convenient grades on suitable and sufficient structures  *  *  *  not less than fourteen feet above the street surface.  *  *  *  The said railroad tracks shall run on an elevated steel structure over the right of way of said railroad companies as now in possession at such grade elevation that they shall cross over all intervening streets and avenues at such grade as to leave the same unobstructed on the surface, and open to the free passage of pedestrians and vehicles with a clear height at each crossing of not less than fourteen feet."

In other words, the statute provided that the railroad tracks as they were when the act went into effect, should be physically removed from the surface of Atlantic avenue and placed at some points sixteen feet below the surface and at others upon elevated tracks at least fourteen feet above the surface, with an open cut to make the transition from the underground to the elevated structure. The companies were authorized to erect stations and platforms on either side of the railroad at any points along the tracks as depressed to take the place of those existing on the surface. It was required that such stations should be below the surface of the street and that the use thereof when constructed should "in no way interfere with the grade of Atlantic Avenue, or the free use of said avenue by the public save so far as the same may be affected by the supports for stations along the elevated structures hereinabove provided for."

The act further provided for a board whose duty it was to

direct and superintend the construction of said improvement by the company, and the expense, not exceeding $1,250,000 on the part of the city, was to be borne one-half by the city and the other half by the railroad corporation. The expense of erecting the stations, however, was not to be included in the cost of the improvement.

It was also enacted that " said depressed right of way and tracks and the elevated portions of said railroad  *  *  * shall be employed for the uses and purposes of the said The Long Island Railroad Company to the same extent and as fully and completely as the railroad at present constructed which is operated by the said company." The operation of passenger trains was to be by some power other than steam, except that steam locomotives might be used to move freight trains, and in cases of emergency passenger trains also. The final command of the legislature as addressed to the railroads was as follows : " When completed, the Long Island Railroad Company, as the lessee of the said Atlantic Avenue Railroad Company of Brooklyn, its successors or assigns, are authorized and directed to run their trains over the said improvement  *  *  *,  as constructed and authorized by law."

In view of the situation when the act was passed, and the language used by the legislature, it seems clear that the intention was to remove all railroad tracks from the surface of Atlantic avenue. While the term " steam railroad " appears in both title and text, that was merely a description of the obstacle to be done away with, and no permission to put another in its place was given directly or indirectly. " The existing surface railroad tracks " were to be " removed from the surface as now operated " and put below or raised above the level of the street. The improvement was to leave the avenue " unobstructed on the surface and open to the free passage of pedestrians and vehicles." There was to be a " complete restoration of the surface of Atlantic Avenue." The depression was to be at a safe distance, not less than sixteen feet, below the surface, and the elevation at a safe distance, not less than fourteen feet above, sufficient in each case

to permit the untrammeled use of the avenue for highway purposes. The surface of the street was to be free from the railroad, its tracks, fences, gates, signal posts and the like. The situation was to be completely changed. The old things were to pass away and the avenue was no longer to be a surface railroad street.

The improvement was made and paid for as required by the act. The double tracks authorized by the charters of the railroad companies were removed bodily from the surface of the avenue and placed above or below throughout its entire length. The railroads accepted the change and thus surrendered possession of the surface of Atlantic avenue. All trains are now run upon tracks which have been moved away from their former location as completely as if they had been transferred into another street.

The railroad companies, however, claim the right to lay new tracks on the surface of the avenue in order to operate a trolley line thereon, alleging that it is needed as a " feeder " to the other line. To quite an extent this would restore the evil which, after prolonged discussion, with much difficulty and great expense, was removed by the express command of the legislature. They found their claim on a general act passed in 1899, entitled " An act to regulate the use of lands forming part of the right of way of any railroad company, the road of which has been removed from the surface in, or adjacent to, streets and highways in all cities of the first class in this state." (L. 1899, ch. 497.) It provides that " whenever the right of way, grade or tracks of any steam railroad company in or adjacent to any street or highway in any city of the first class are required by law to be changed or altered by elevating or depressing the same for the purpose of discontinuing the use of steam power upon the surface of such highway or street, such alteration or change of grade shall not be deemed to curtail or affect any right which such railroad company or its lessees or assigns may have to maintain and operate a surface passenger railway within the limits of the right of way so depressed or elevated, and over and under

the railroad tracks so depressed or elevated, with all turn-outs, sidings and tracks necessary to secure the continuous connection and operation of such surface railroad."

At the three points of transition between the depressed and elevated tracks, the companies allege that in order to secure a continuous connection and operation of their proposed trolley line it is necessary to occupy portions of Atlantic avenue outside of the "thirty-foot" strip for the distance of about one mile in the aggregate. As they were unable to obtain the consent of the majority of the owners of property abutting on said turnouts, they made the application now before us to the Appellate Division of the Supreme Court. That application was denied, but the learned court did not favor the parties or ourselves with their reasons for this important decision, affecting many interests, both public and private.

The respondents claim that if the acts of 1897 and 1899, when read together, authorize the construction of a trolley road on the surface of Atlantic avenue, they violate the Constitution of the state by permitting the construction and operation of a street railroad, without the consent of the requisite number of abutting owners and of the local authorities in charge of the street, neither of which the appellants have. (*Matter of Third Avenue R. R. Co.*, 121 N. Y. 536, 541.)

The Constitution provides that the Legislature shall not pass a private or local bill " granting to any corporation, association or individual the right to lay down railroad tracks," or " granting to any private corporation, association or individual any exclusive privilege, immunity or franchise whatever." The Legislature, however, may " pass general laws providing for " these cases and for all others " which in its judgment may be provided for by general laws." The power even to pass general laws relating to the cases named are subject to the limitation that " no law shall authorize the construction or operation of a street railroad except upon the condition that the consent of the owners of one-half in value of the property bounded on, and the consent also of the local

authorities having the control of, that portion of a street or highway upon which it is proposed to construct or operate such railroad, be first obtained, or in case the consent of such property owners cannot be obtained, the Appellate Division of the Supreme Court in the department in which it is proposed to be constructed, may, upon application, appoint three commissioners who shall determine, after a hearing of all parties interested, whether such railroad ought to be constructed or operated, and their determination, confirmed by the court, may be taken in lieu of the consent of the property owners."

The consent of the property owners, or if that cannot be had, the consent of the Appellate Division, is not enough, for the consent also of the local authorities is an absolute prerequisite to the construction or operation of a street railroad.

If the railroad that was removed from the surface of Atlantic avenue and the new line proposed to be constructed where the old line stood, are two railroads, each physically independent of the other, although owned in common, it is obvious that the legislature had no power to authorize the construction or operation of the latter, for it is restrained by the Constitution from granting a franchise to lay down railroad tracks. It is necessary, therefore, to see what was the purpose and effect of the two acts.

The learned counsel for the appellant claims that the purpose of the act of 1899 was " to put to rest any question that the Atlantic Avenue Improvement Act had affected the right of the petitioning companies to use their right of way over the depressed or under the elevated railroad for railroad purposes ;" that it embraced " the grant of a franchise in the adjoining portion of a highway to construct such turnouts as might be necessary to make such tracks a continuous line ;" that the operation of the proposed trolley upon the surface of the old right of way is not a new railroad, and that " the act of 1899 was constitutional and repealed all restrictions upon the use of this strip by the Long Island Railroad for an electric surface passenger line, if any such was contained in the Atlantic Avenue Improvement Act."

The claim that the special charters of the Brooklyn and Jamaica and the Long Island Railroad companies, by authorizing "a railroad with a single or double track, and with such appendages as may be deemed necessary for the convenient use of the same" (L. 1832, ch. 256, and L. 1834, ch. 178), permitted the use of a trolley line before the constitutional provision above quoted was adopted, is involved in the primary and controlling question whether the proposed trolley line is a new road or merely an appendage or part of an old road, such as the addition of a third rail might be. Perhaps a more accurate statement of the question would be to ask whether the effect of both acts is to put two railroads in a street where there was but one before. Were it not for the limitation in the charters of the companies there would be some reason for holding that even a third track should not be regarded as a new road. Such a track would have so intimate and inseparable a connection with the road as to give color to the claim that it was a part thereof. Such, however, is not the situation presented by this appeal. Here we have two roads, not of the same kind or on the same level. One is wholly an underground or elevated road for through travel, reaching far into the country and with no surface grade until the city boundary is passed, while the other is an ordinary street railroad, built on the surface, for local traffic within the limits of the city. Each road is an independent entity, existing by itself, operated by its own method, with its own tracks, signals and appliances, which are used exclusively by itself. Each may be separately owned, sold, mortgaged and managed. Neither has any physical connection with the other. Annihilate either and the other continues to exist in the same condition as before, with every power and capacity unimpaired. Neither trains nor cars can be transferred from one to the other. They need not be of the same gauge, although doubtless they are. A surface railroad is separate and distinct from an underground or overhead railroad, even when directly over the one or under the other. Neither is part of the other, but each is an entirety

in itself.  The subject is so controlled by perception and cognition as to make rules of logic difficult of application. Describe the roads, and two different things appear before the mind, as distinct as the right hand from the left; the one a surface railroad and the other an underground or overhead railroad, and neither belonging to or connected with the other.

We think that the effect of the two statutes was to authorize two roads in Atlantic avenue where only one existed before, and the last to be constructed is a street railroad, to which the Constitution so pointedly applies.  The appellants have no right to construct or operate a trolley line on the surface of Atlantic avenue past the property of the respondents, and, therefore, the application to appoint commissioners to determine whether sidings and turnouts should be constructed in aid thereof was properly denied.

The order appealed from should be affirmed, with costs.

CULLEN, Ch. J., EDWARD T. BARTLETT, HISCOCK and CHASE, JJ., concur; O'BRIEN and HAIGHT, JJ., dissent.

Order affirmed.