THE LONG ISLAND RAILROAD COMPANY et al., Appellants, *v.* THE CITY OF NEW YORK et al., Respondents.

**Railroads — rights of railroad companies operating railroads in Atlantic avenue, Brooklyn — company not authorized to construct and operate trolley railroad on strip above or below steam railroad.**

The Long Island Railroad Company and the Nassau Electric Railroad Company have not such a title in and to the thirty-foot strip which constitutes their right of way along the center of Atlantic avenue from Flatbush avenue on the west to Atkins avenue on the east in the borough of Brooklyn as to give them the right to lay and maintain railroad tracks thereon for the operation of a surface railroad in connection with and as a part of their railroad which is now operated within said thirty-foot strip, partly in depressed tunnels and partly upon elevated structures with such intervening inclines as are necessary to the combination.

The decision of the question which arose and was determined in *Matter of Long Island Railroad Company* (189 N. Y. 428), necessarily involved the final and conclusive definition of the plaintiff's rights in every part of the widened Atlantic avenue, except the small portion between Stone and Atkins avenues, which is not affected by an agreement known as the "tripartite agreement," such agreement having been complied with by the respective parties thereto under the sanction of chapter 475 of the Laws of 1855.

Under the rule of *stare decisis*, based upon the decision in *Matter of Long Island Railroad Company* (*supra*) and under the interpretation now given to the tripartite agreement and the statute of 1855, neither the plaintiffs nor their predecessors in title or interest ever acquired a title in fee to any part of the thirty-foot strip in the center of Atlantic avenue west of Stone avenue, and their only right or interest therein consisted of an easement to occupy and use the same for railroad purposes.

As to the thirty-foot strip, beginning at Stone avenue and extending eastwardly to Atkins avenue, the legal presumption is that the provisions of certain statutes enacted in 1869 and 1870 were complied with, and that the railroad companies either voluntarily relinquished the fee which they had held or received proper compensation through the awards of the commissioners. Further, the complaint states no cause of action which so specifically applies to this stretch of territory as to entitle the plaintiffs to judgment on their failure as to the more westerly portions of the right of way.

A demurrer was properly sustained, because the facts set forth in the complaint do not constitute a cause of action, and final judgment was correctly ordered therein, for the facts are matters of record which cannot be changed by an amendment of the pleading.

(*Matter of Long Island R. R. Co.*, 189 N. Y. 428, followed.)

*Long Island R. R. Co.* v. *City of New York*, 134 App. Div. 928, affirmed.

(Argued June 6, 1910; decided October 11, 1910.)

Appeal from an order of the Appellate Division of the Supreme Court in the second judicial department, entered October 8, 1909, which affirmed a final judgment entered upon a decision at Special Term sustaining a demurrer to the complaint.

Atlantic avenue is one of the streets of the borough of Brooklyn in the city of New York, running from the East river in an easterly direction to the village of Jamaica. Flatbush avenue crosses Atlantic avenue at a distance of 1.427 miles from the river. The plaintiffs' railroad commences at this point and runs easterly through the center of Atlantic avenue. The plaintiff Nassau Electric Railroad Co., as the successor in title of the former Brooklyn & Jamaica R. R. Co., claims to be the owner in fee of the railroad right of way located upon the surface and in the center of Atlantic avenue, 30 feet in width, between Flatbush avenue on the west and Atkins avenue on the east; and the

19

plaintiff, the Long Island R. R. Co., is the lessee of the railroad which is being operated upon it. The plaintiffs suggest that this title is to be considered as composed of four separate sections, because each is affected by different and distinct acts and proceedings. These sections may be briefly described as follows: 1. The area between Flatbush avenue and Classon avenue, which latter avenue is about 14 blocks east of Flatbush avenue. 2. The block between Classon avenue and Franklin avenue. 3. The stretch between Franklin avenue and Stone avenue, which latter avenue was the old easterly boundary line of the former city of Brooklyn. (This third section covers the territory involved in our decision in *Matter of Long Island R. R. Co.*, 189 N. Y. 428.) 4. The piece between Stone avenue and Atkins avenue, a distance of about 1.40 miles. To understand the relation of these claims to the present situation it is necessary to repeat and amplify the facts set forth in 189 N. Y. 428.

In 1855 the so-called tripartite agreement was entered into between the Brooklyn and Jamaica R. R. Co., predecessor in title of the plaintiff the Nassau Electric R. R. Co.; the Long Island R. R. Co., as lessee, and the city of Brooklyn. That agreement covered the area included within the first three sections above mentioned, but did not cover the fourth. Under it the railroads relinquished their title to the right of way on which they originally ran, and accepted in lieu thereof a 30-foot strip in the center of Atlantic avenue. The plaintiffs assert that under this agreement and other antecedent proceedings they got title in fee to this 30-foot strip; while the city claims that they only took an easement for railroad purposes.

The tripartite agreement was followed in 1897 by the "Atlantic Avenue Improvement Act" (Ch. 499) and this covered all four sections. Under that act the plaintiffs were required to remove their railroad from the surface of the avenue, and operate it in subways, open cuts and on elevated structures. The plaintiffs complied with its provisions, but claim that they still have title in fee to the 30-foot strip over

which they seek to operate surface cars, in addition to their railroad in the subways and on the elevated structures as now operated.

As bearing upon that contention the material facts set forth in the complaint are, in substance, as follows: The Brooklyn & Jamaica R. R. Co., which was the predecessor in title of the present plaintiff, the Nassau Electric Railroad Co., was organized pursuant to the provisions of Laws of 1832, ch. 256. Shortly thereafter it acquired a strip of land extending over the entire distance here in question. This strip of land was partly within and partly without the bounds of what is now Atlantic avenue. When this strip of land was acquired Atlantic avenue, or Atlantic street as it was originally called, had not been extended farther east than Flatbush avenue. Atlantic avenue was thereafter and at different times extended and widened to its present width of 120 feet. This railroad strip commenced at about what is now the intersection of Atlantic avenue and Flatbush avenue, within the present lines of the former avenue, forming the southerly eighty feet thereof, and running at that width easterly to a point between Classon and Franklin avenues, a distance of about 15 blocks. Here it turned northeasterly, crossing Atlantic avenue, passing to the north of its present bounds about 100 feet, where it again turned eastwardly and ran parallel to the avenue, at a width of fifty feet but not within the present lines of the avenue. At Stone avenue it turned south to a point in about the center of the present Atlantic avenue and from thence it continued eastwardly. This was the general situation of the *locus in quo* prior to the widening and extending of Atlantic avenue.

In 1851 Atlantic avenue had been opened from about the present line of Flatbush avenue to Bedford avenue, which latter avenue is one block east of Franklin or 16 blocks east of Flatbush. Atlantic avenue as then laid out was only 70 feet in width, which consisted of 30 feet taken from the northerly part of the 80-foot railroad strip and 40 feet from private owners bounding the railroad lands on

the north, and it ran within the present lines of the avenue only to a point between Classon and Franklin avenues. The railroads thus retained title to 50 feet of their original strip, and this 50-foot strip bounded the then avenue on the south and extended as far eastwardly as the point referred to between Classon and Franklin avenues. The plaintiffs allege that when this 30 feet was taken from the railroad, the city acquired nothing more than an easement therein for street purposes, and that the fee still remained in the predecessor of the plaintiff Nassau Electric R. R. Co.

In 1855 the city of Brooklyn, the Brooklyn & Jamaica R. R. Co. (the predecessor in title of the plaintiff Nassau Electric R. R. Co.) and the Long Island R. R. Co. as lessee, entered into the tripartite agreement, and at that time the Brooklyn and Jamaica R. R. Co. owned, as we have seen, a strip of land 50 feet wide bounding the then Atlantic avenue on the south and extending from Flatbush avenue to a point between Classon and Franklin avenues; a strip crossing the avenue at that point; a further strip 50 feet wide north of the avenue beginning at that point and running eastwardly as far as Stone avenue; and from thence easterly it owned its right of way in the center of the present line of the avenue at least as far easterly as Atkins avenue. As to the territory east of Atkins avenue there is no controversy.

Under that tripartite agreement of 1855 the city was to widen Atlantic avenue to the width of 120 feet and to extend it to Stone avenue, which was then the easterly boundary line of the city.

The agreement provided : 1. That the railroad should convey to the city for the purpose of a public street the strip of land 50 feet wide lying to the south of the avenue and extending from Flatbush avenue to Classon avenue. The city, on its part, agreed to grant to the railroads " the right to use and occupy a space thirty feet in width in the center of Atlantic Avenue after it shall have been so widened for the purpose of railroad tracks    *    *    *    so long as said street shall be maintained as a public street." 2. The railroads agreed to sell and

convey to the city, at a sum to be ascertained, the land owned by them between Classon and Franklin avenues, which was the part of the railroad strip where it turned north and crossed the avenue. This was also on condition that the railroad should have the right to occupy a space 30 feet wide within the street for the purpose of railroad tracks and turnouts. 3. The railroad companies agreed to convey to the city the 50-foot strip owned by the Brooklyn and Jamaica R. R. Co. which lay north of the present bounds of the avenue extending from the westerly side of Franklin avenue to the then city line at Stone avenue. This strip was not to be included in the avenue, but was to be sold to private parties. The city in return agreed to give to the railroad companies the " exclusive right to use and occupy a strip or space of the width of thirty feet in the center of said Atlantic Avenue," as widened. This third portion of the agreement covered the part of the *locus in quo* under consideration in *Matter of Long Island R. R. Co.* (189 N. Y. 428).

The terms of this agreement were afterwards complied with by the respective parties thereto under the sanction of an act of the legislature thereafter passed. (L. 1855, ch. 475.) After the completion of the changes provided for by the agreement and legislation referred to, the railroad occupied a space of 30 feet in width in the center of Atlantic avenue from Flatbush avenue to Stone avenue, and this continued to be the situation, so far as the first three sections were concerned, down to the time when what is known as the " Atlantic Avenue Improvement Act " (L. 1897, ch. 499), hereafter referred to, went into effect. The foregoing facts relate exclusively to the plaintiffs' claim to the right to operate their railroad upon the surface over the first three sections of the right of way involved in this action.

There is a further portion of the railroad right of way involved in this action which was originally owned by the Brooklyn & Jamaica Railroad Co. in fee, but was not affected by the tripartite agreement. That stretch extends from Stone avenue (the old city line) east to Atkins avenue, a dis-

tance of about 1.40 miles, in the center of Atlantic avenue, and is a continuation of the right of way granted to the railroads under the tripartite agreement. The only allegation of the complaint in respect to it is that it belongs to the plaintiff the Nassau Electric Railroad Co. This portion of Atlantic avenue was opened under the authority of Laws of 1869, ch. 217, which provided for the acquisition of the necessary land through the usual method by commissioners; the payment of awards to the owners of the land taken, and the vesting of title thereto in the town of New Lots for highway purposes. The avenue was to be continued to the division line between Kings and Queens counties. The railroad owned this strip before the act of 1869 was passed, and there is nothing of record to show whether it was acquired by the town of New Lots, which thereafter became a part of the city of Brooklyn.

Prior to 1896 the railroad had been operated upon the surface of Atlantic avenue with steam as motive power. Owing to the pressure of public opinion, the use of steam was prohibited in 1859 and its use was again permitted in 1876, but in 1896 the feeling against its continuance became so pronounced as to call for action by the municipal authorities. The result was that the legislature in the latter year passed an act (Ch. 394) authorizing the mayor to appoint a commission to report a plan for the improvement of the then existing conditions. A commission was appointed and made a report recommending that the tracks of the plaintiffs' railroad from Flatbush avenue to Atkins avenue be laid in subways, open cuts, and on elevated structures according to plans submitted, thus relieving the surface of the street from the burden of the trains as then operated. The report also indicated that the commissioners intended that surface cars should be run by electricity for the accommodation of local travel as auxiliary to the through trains which were to be operated in the subways and upon the elevated structures so as to connect at or about Flatbush avenue with a similar road running west to the borough of Manhattan. Upon the submission of this report the legislature, in the following year, enacted chapter 499, Laws of 1897.

That act embodied the substance of the recommendations of the commissioners and directed the plaintiffs to build the subways, cuts and elevated structures, but was silent as to the operation of any permanent surface railroad and it prohibited the employment of steam locomotives, except in cases of emergency and for freight trains. The railroads paid the greater part of the expense of this improvement; the city being restricted to an expenditure of $1,250,000. The plaintiffs complied with the directions of the act, both in respect of that part of their line lying between Flatbush and Stone avenues, which they occupied under the provisions of the tripartite agreement; and also as to the 1.40 miles lying between Stone and Atkins avenues, to which they claim the fee under their original title.

With the act of 1897 there was presented to the legislature a bill which provided as follows: Section 1. " Whenever the right of way, grade or tracks of any steam railroad company in or adjacent to any street or highway in any city of the first class are required by law to be changed or altered by elevating or depressing the same for the purpose of discontinuing the use of steam power upon the surface of such highway or street, such alteration or change of grade shall not be deemed to curtail or affect any right which such railroad company or its lessees or assigns may have to maintain and operate a surface passenger railway within the limits of the right of way so depressed or elevated, and over and under the railroad tracks so depressed or elevated, with all turnouts, sidings and tracks necessary to secure the continuous connection and operation of such surface railroad."   Section 2 provided that whenever it should be necessary to construct turnouts and sidings which would extend beyond the lines of such right of way, they should only be constructed after obtaining the constitutional consents of the abutting property owners, or in case of failure to secure such consents, by permission of the Appellate Division. This bill was not enacted into a law in that year or in the following year, but did become a law in 1899, being chapter 497 of that year, and was later repealed

by chapter 459, Laws of 1908. Other material facts will be referred to in the subjoined opinion.

*George W. Wingate, Charles A. Collin* and *Joseph F. Keany* for appellants. The appellants were entitled to have the city enjoined from forcibly interfering with their possession of this right of way, from destroying the $250,000 worth of its property which is located thereon and from depriving them of its exclusive possession until the conflicting rights of the parties have been adjudicated by the courts. (*O'Donnell* v. *McIntyre*, 16 Abb. [N. C.] 84; *People* v. *Bd. of Health*, 140 N. Y. 8; *Shields* v. *Ohio*, 95 U. S. 319; *Miller* v. *State*, 82 U. S. 478; 2 Elliott on Railroads, § 660.) The Atlantic avenue improvement commission was a governmental agency of the state and the change of grade that they directed was wholly in the interest of the state and not for the benefit of the railroad which had no power to prevent it. It is not liable for their acts. (*Lewis* v. *N. Y. & H. R. R. Co.*, 162 N. Y. 202, 226; *Leffman* v. *L. I. R. R. Co.*, 120 App. Div. 529; 197 N. Y. 513.) The report of the commission may be properly referred to to ascertain the intention of the legislature in passing these acts. (*People ex rel. Kemmler* v. *Durston*, 119 N. Y. 569; *U. S.* v. *D. & H. C. C. Co.*, 213 U. S. 366; *Binns* v. *U. S.*, 194 U. S. 486; *Holy Trinity Church* v. *U. S.*, 143 U. S. 465; *The Delaware*, 141 U. S. 474; *Mosle* v. *Bidwell*, 130 Fed. Rep. 336.) The commission which prepared the plans and specifications involving the construction of this surface railroad as a part of the improvement and which required the Long Island Railroad Company to build it, was a governmental agent of the state. (*Sander* v. *State*, 182 N. Y. 400; *Lewis* v. *H. R. R. Co.*, 162 N. Y. 202.) The Brooklyn and Jamaica Railroad Company became vested with the fee of the strip thirty feet wide constituting its right of way between Gowanus lane (*i. e.*, Flatbush avenue) and Classon avenue by reason of the fact that it was the owner of such fee subject to the easement taken by the city for street purposes, and that

such easement was annulled and possession returned to the railroads by the tripartite agreement.   (*Heard* v. *City of Brooklyn*, 60 N. Y. 242.)   The exclusive right forever to use this strip cannot be taken from the railroad without compensation.  (*Mayor, etc.*, v. *T. T. S. R. R. Co.*, 113 N. Y. 316.) The general act of 1899 (Ch. 497) authorizes the construction and operation of steam railroad tracks, and of steam railroad tracks only, on the surface of the right of way of a steam railroad corporation whose tracks or grade are required by law to be elevated or depressed ; and such general act of 1899 does not authorize nor purport to authorize the construction or operation of street railroad tracks on the surface of such right of way ; and, therefore, said act of 1899 does not violate the provision of the State Constitution that "no law shall authorize the construction or operation of a street railroad, except upon the condition" that the consents of local authorities and of abutting owners shall be first obtained. (*People* v. *B. H. R. R. Co.*, 187 N. Y. 48.)

*Archibald R. Watson, Corporation Counsel (James D. Bell* of counsel), for respondents.   The complaint stated no cause of action and the demurrer thereto was properly sustained.   (L. 1869, ch. 217 ; L. 1855, ch. 475 ; *Matter of L. I. R. R. Co.*, 189 N. Y. 428.)

WERNER, J.   This case comes to this court on appeal from an order of the Appellate Division in the second department, affirming a final judgment entered at Special Term which sustained a demurrer to the complaint.   The allegations of the complaint, which are extremely voluminous, have been epitomized in the foregoing statement of facts.   The plaintiffs are two railroad corporations ; the Nassau Electric Railroad Company, which is the owner and lessor, and the Long Island Railroad Company which is the operator and lessee of the railroad which runs through Atlantic avenue in the borough of Brooklyn.   The defendants are the city of New York and several of its officers.   For the purposes of this dis-

cussion we shall refer to them respectively as the plaintiffs and the defendant.

The allegations of the complaint and the claims of the plaintiffs, reduced to their substance, are that the plaintiffs have such a title in and to the thirty-foot strip which constitutes their right of way along the center of Atlantic avenue from Flatbush avenue on the west to Atkins avenue on the east, as to give them the right to lay and maintain railroad tracks thereon for the operation of a surface railroad in connection with and as a part of their railroad which is now operated within said thirty-foot strip, partly in depressed tunnels and partly upon elevated structures with such intervening inclines as are necessary to the combination; that in pursuance of such right, and in accordance with the reports, plans and specifications of the Atlantic avenue improvement commission, authorized and approved by legislative authority, the plaintiffs have laid tracks upon the surface of said thirty-foot strip over the depressed tunnels and under the elevated structures at great expense; that the defendant threatens and intends to remove said surface tracks because, as claimed by it, they are unauthorized and constitute an unlawful obstruction in the highway, and the relief prayed for in the complaint is that an injunction issue restraining the defendant from entering upon the said thirty-foot strip for the purpose of interfering with its possession by the plaintiffs and removing therefrom any of said surface tracks, curbing or other structures laid or erected thereon by the plaintiffs, and that the title or right of the plaintiffs in and to said thirty-foot strip may be adjudged. The demurrer of the defendant is based upon the ground " that the complaint does not state facts sufficient to constitute a cause of action."

At Special Term the demurrer was sustained upon an opinion of Mr. Justice Crane, written in denying a motion to make permanent the preliminary injunction granted herein. At the Appellate Division there was an affirmance, without opinion, of the final judgment entered upon the order sustaining the demurrer.

The opinion of Mr. Justice Crane, referred to, makes it clear that his decision was based upon the decision of this court in *Matter of Long Island Railroad Company* (189 N. Y. 428), and, presumably, the Appellate Division based its order of affirmance upon the same ground. A careful study of that opinion (189 N. Y. 428) leaves no room for doubt as to the character and extent of our decision in *Matter of Long Island Railroad Company*. It defined most carefully and conclusively the rights of the plaintiffs under the tripartite agreement, the legislation of 1855 and the legislation of 1897 and 1899, as to all of the territory described in the complaint, except the stretch of 1.40 miles between Stone and Atkins avenues, which, as appears from the foregoing historical survey of the subject, is differentiated from the rest of the railroad right of way within the former corporate limits of Brooklyn, because it is not affected by the tripartite agreement and the legislation of 1855. The *Matter of Long Island Railroad Company* arose, it is true, in a different manner between different parties, and the particular question there at issue affected only the right of way between Franklin and Stone avenues, where the railroad lands of the plaintiffs were north of, and entirely outside of, Atlantic avenue as widened, but that particular question was governed by the broad and underlying question whether the plaintiffs had such right or title in the substituted right of way, within the limits of the widened Atlantic avenue, as to entitle the plaintiffs to construct and maintain a surface railroad in addition to the railroad operated in the depressions and upon the elevations referred to. The decision of that question necessarily involved the final and conclusive definition of the plaintiffs' rights in every part of the widened Atlantic avenue except the small portion between Stone and Atkins avenues not affected by the tripartite agreement and the legislation of 1855. As to all except that short stretch the effect of the tripartite agreement and the legislation of 1855 was to give the plaintiffs " the exclusive right to use and occupy the thirty foot strip forever for the purpose of railroad tracks and turnouts and running

locomotives and cars thereon without interruption or molestation." (P. 438.) This language of both agreement and statute, when contrasted with the phraseology by which the plaintiffs made their cession and conveyance to the defendant, was held not to describe clearly a title in fee, but with greater clearness to describe an easement, which was all that the plaintiffs needed for their railroad purposes, and which, "according to the principle of strict interpretation governing the subject, was all they took." In the light of our further study of the agreement and statute of 1855, we now conclude that Judge Vann, who wrote for the court in *Matter of Long Island Railroad Company* (*supra*), might have stated his conclusions against the railroad companies even more strongly than he did. The language of both agreement and statute is that the plaintiffs shall "cede and convey to the City of Brooklyn the land on the south side of Atlantic Avenue between Gowanus Lane and Classon Avenue" owned by the Brooklyn and Jamaica R. R. Co., upon condition that the said railroad company, "its lessees, successors and assigns, shall have from and after this date the right to use and occupy a space of thirty feet in width in the center of said Atlantic Avenue after it shall have been so widened, for the purpose of railroad tracks, to be used by the parties of the first and second parts and their respective successors and assigns so long as said street shall be maintained as a public street, in the same manner and for the like purpose that they or either of them now use and occupy the said strip of land so to be ceded." This unequivocal cession and conveyance is followed by the reciprocal covenant of the city of Brooklyn to accept it and to grant to the railroads the right to occupy and use the thirty-foot right of way in the center of the widened Atlantic avenue for railroad purposes as set forth. The cession and conveyance by the railroads necessarily imported a transfer of the fee to the city. So much must be conceded, even if it be a fee burdened with a trust for street purposes. A radically different implication arises from the "right to use and occupy" a space thirty feet

wide in the center of Atlantic avenue. Had there been an intention reciprocally to convey to each other, the parties and the legislature would not have used the contrasting phrases "cede and convey" in the one instance and "the right to use and occupy" in the other. Substantially the same difference is found in the language relating to the land owned by the railroad companies between Classon avenue and Franklin avenue. The railroads "sell and convey" to the city of Brooklyn such portion of the land "as shall be required for the purpose of extending Atlantic avenue of the width of one hundred and twenty feet," and the railroads were to receive as part of the consideration "the right of *occupying* a space in the center of said avenue, as thus extended, of the width of thirty feet for the purposes of railroad tracks and turnouts without interruption or molestation."

And, again, in that part of the agreement which relates to the stretch from Franklin avenue to Stone avenue, where the railroad was not within the lines of Atlantic avenue as it was to be extended, the railroad companies agreed to "cede and convey" to the city of Brooklyn "the strip of land of fifty feet in width now owned by the parties of the first part and occupied by the railroad tracks  *  *  *  upon this express condition, that the parties of the first and second parts shall forever have the exclusive right to use and occupy a strip or space of the width of thirty feet in the center of said Atlantic Avenue as so extended and in the center of Schuyler Street as thus widened, from the intersection of Atlantic Avenue to the easterly line of the city as thus widened for the purpose of railroad tracks and turnouts, and the running of locomotives and cars thereon, without interruption or molestation." The reiteration with which these opposing phrases were used in attempting to define the rights of the parties to the compact compels the conclusion that the city of Brooklyn took the fee in the lands conveyed to it by the railroad companies, and the latter took an easement to occupy and use a strip thirty feet in width in the center of Atlantic avenue as widened and extended to Stone avenue. Thus, under the rule of *stare decisis,*

based upon our decision in *Matter of Long Island Railroad Company* (*supra*) and under the interpretation which we now give to the tripartite agreement and the statute of 1855, we hold that neither the plaintiffs nor their predecessors in title or interest ever acquired a title in fee to any part of the thirty-foot strip in the center of Atlantic avenue west of Stone avenue, and that their only right or interest therein consisted of an easement to occupy and use the same for railroad purposes.   And lest there may be further confusion or misunderstanding of our decision upon that question, we may add that this applies to the Nassau Electric Railroad Company as well as to the Long Island Railroad Company.   The former, the present owner and lessor of the railroad, although not organized until 1893, acquired no greater rights or interests in Atlantic avenue than its predecessors in title.   The detailed history of the transmutations of that title is not essential to the present discussion.   It is enough to say in that behalf that in 1865 there was a foreclosure under which one Richardson acquired the title to the Brooklyn Central and Jamaica R. R. Co., which was the successor in interest, through mesne conveyances, consolidations and proceedings, of the original Brooklyn and Jamaica Railroad Company.   In 1872 Richardson and others organized the Atlantic Avenue Railroad Company, and in 1893 the present Nassau Electric Railroad Company became its successor.   The latter has only such rights in Atlantic avenue as its predecessors had, and all that was done under the tripartite agreement and the legislation of 1855 is as binding upon it as it was upon them.

As to the thirty-foot strip, beginning at Stone avenue (the old city line) and extending eastwardly for a distance of 1.40 miles to Atkins avenue (the present city line), it appears that that is a part of the right of way originally owned by the Brooklyn and Jamaica Railroad Company which was not affected by the tripartite agreement or the statute of 1855. It was outside of the corporate limits of Brooklyn in the town of New Lots.   In 1869 the legislature passed an act (Chap. 217) authorizing the Supreme Court in the second judicial

department to appoint commissioners charged with the duty of laying out in said town "a street or avenue, in continuation of Atlantic Avenue, in the city of Brooklyn, and extend the said avenue in an easterly direction from Van Linderin avenue to the division line between Kings and Queens counties, the said avenue to be located within the same lines and to be of the same width as it is now laid and opened to the westerly portion of said town of New Lots." (Section 2.) That statute further provided that "if the owners of the land lying in the said avenue so to be laid out, shall not, within three months after notice of the laying out of said avenue and recording of said description thereof, convey the land owned by them, respectively, to the town of New Lots, for the purposes of a public street or highway, the said commissioners shall proceed to estimate the value of any lands and buildings not so conveyed." (Section 3.) By a subsequent amendment (Chap. 619, L. 1870) it was further provided that upon confirmation of the commissioners' report "the lands for which awards shall be made thereon shall vest in the town of New Lots, for the purposes of a public street or highway." (Section 2.)

This statute, although not referred to in the complaint, is a legislative act of which the courts may take judicial cognizance, and under which certain legal presumptions arise. Although the record before us does not contain a report of the proceedings under the acts of 1869 and 1870, the subsequent physical situation, as shown by the record, conclusively fortifies the presumption that the provisions of those statutes were complied with, and that the railroad companies either voluntarily relinquished the fee which they had held, or received proper compensation through the awards of the commissioners. Quite aside from these considerations, the subsequent history of the railroads and their relation to Atlantic avenue makes it plain that the nature and extent of the title or right of the plaintiffs in and to the thirty-foot strip extending from Stone avenue easterly to Atkins or Sheppard avenue is of no importance. We may add, moreover, that the complaint

states no cause of action which so specifically applies to this stretch of territory as to entitle the plaintiffs to judgment if they fail as to the more westerly portions of the right of way.

We now pass to the consideration of what may appropriately be designated as the second chapter of this history, which consists of the legislation of 1896 (Chap. 394), of 1897 (Chap. 499), of 1899 (Chap. 497) and of the various proceedings thereunder. The first of these statutes is entitled " An act to authorize the appointment of a commission to examine into and report a plan for the relief and improvement of Atlantic avenue in the city of Brooklyn," and in that connection it is pertinent to observe that the limits of the city of Brooklyn had then been extended so as to include the stretch of railroad running from Stone avenue (the old city line) to Atkins or Sheppard avenue, which is the dividing line between the counties of Kings and Queens and the present easterly line of the borough of Brooklyn. As the title of this act indicates, its purpose was to initiate proceedings for the betterment of the conditions which existed in Atlantic avenue owing to the presence of a steam railroad upon its surface. That the conditions were such as to justify this action is attested by the very full and intelligent report of the commissioners appointed, and by the subsequent acquiesence of all the parties concerned, which resulted in what is colloquially known as the Atlantic Avenue Improvement Act (L. 1897, Chap. 499). Among the recommendations contained in the report, two stand out in conspicuous prominence. 1. The removal of the railroad from the surface of the street. 2. The substitution of electricity for steam as a motive power. To accomplish the first result, the topography of Atlantic avenue, no less than the necessity for economy, suggested a composite plan under which the railroad was to be depressed in tunnels at various points in the route, and elevated at others, with such surface and inclined connections as the details of the plan might require. As to this part of the plan there is no controversy or misunderstanding for it was, in substance if not in detail, carried into the statute of 1897

(Chap. 499) and acted upon by the railroad companies and the city of Brooklyn. That feature of the case may be summarized in a sentence. The Long Island Railroad Company, as lessee, is now operating by electric motive power the railroad owned by the Nassau Electric Railroad Company, its lessor, in tunnels and upon elevated structures over the same right of way provided for under the tripartite agreement and the statute of 1855, and this change has been effected by the joint action of the parties concerned, under the sanction of the act of 1897. As to this situation, which is now precisely the same as it was when we decided *Matter of Long Island Railroad Company (supra)*, we said in the opinion in that case: " The improvement was made and paid for as required by the act. The double tracks authorized by the charters of the railroad companies were removed bodily from the surface of the avenue and placed above or below throughout its entire length. The railroads accepted the change *and thus surrendered possession of the surface of Atlantic avenue.* All trains are now run upon tracks which have been moved away from their former location as completely as if they had been transferred into another street." (189 N. Y. 428, 443.)

This brings us to the precise question in controversy, both in *Matter of Long Island Railroad* and in the case at bar. The plaintiffs assert the right to construct and operate a surface railroad in connection with and as a part of the system now being operated below and above grade as stated. They base their claim upon the report of the commissioners appointed under the act of 1896, and upon the statute of 1899 (Chap. 497). It is true, as already stated, that in the former case this question arose in a different form and as to a limited extent of territory. There the issue was tendered upon the application of one of these plaintiffs for the appointment of commissioners to determine whether the tracks for certain turnouts should be laid and it related only to the territory east of Bedford avenue. Here the question arises upon the right of the defendant to remove as unauthorized obstructions in the highway the tracks laid by the plaintiffs in anticipa-

20

tion of obtaining the right to lay the tracks for such turnouts, and the territory embraced is coextensive with the route of the plaintiffs' railroad within the corporate limits of the borough of Brooklyn. But the underlying question is the same. Have the plaintiffs the right to construct and operate a surface railroad, over and under the railroad now owned and operated by them in Atlantic avenue? As that question was necessarily involved in our decision in *Matter of Long Island Railroad Company (supra)*, we will first consider what was there said upon this particular phase of the subject and we can best do that by quoting from the opinion in that case. "The railroad companies, however, claim the right to lay new tracks on the surface of the avenue in order to operate a trolley line thereon, alleging that it is needed as a 'feeder' to the other line. To quite an extent this would restore the evil which, after prolonged discussion, with much difficulty and great expense, was removed by the express command of the legislature. * * * If the railroad that was removed from the surface of Atlantic avenue and the new line proposed to be constructed where the old line stood, are two railroads, each physically independent of the other, although owned in common, it is obvious that the legislature had no power to authorize the construction or operation of the latter, for it is restrained by the Constitution from granting a franchise to lay down railroad tracks. It is necessary, therefore, to see what was the purpose and effect of the two acts. (Statutes of 1897 and 1899.) The learned counsel for the appellant claims that the purpose of the act of 1899 was 'to put to rest any question that the Atlantic Avenue Improvement Act had affected the right of the petitioning companies to use their right of way over the depressed or under the elevated railroad for railroad purposes'; that it embraced 'the grant of a franchise in the adjoining portion of a highway to construct such turnouts as might be necessary to make such tracks a continuous line'; that the operation of the proposed trolley upon the surface of the old right of way is not a new railroad, and that 'the act of 1899 was constitutional and

repealed all restrictions upon the use of this strip by the Long Island Railroad for an electric surface passenger line, if any such was contained in the Atlantic Avenue Improvement Act.'

" The claim that the special charters of the Brooklyn and Jamaica and the Long Island Railroad Companies, by authorizing 'a railroad with a single or double track, and with such appendages as may be deemed necessary for the convenient use of the same' (L. 1832, ch. 256, and L. 1834, ch. 178), permitted the use of a trolley line before the constitutional provision above quoted was adopted, is involved in the primary and controlling question whether the proposed trolley line is a new road or merely an appendage or part of an old road, such as the addition of a third rail might be. Perhaps a more accurate statement of the question would be to ask whether the effect of both acts is to put two railroads in a street where there was but one before. Were it not for the limitation in the charters of the companies there would be some reason for holding that even a third track should not be regarded as a new road. Such a track would have so intimate and inseparable a connection with the road as to give color to the claim that it was a part thereof. Such, however, is not the situation presented by this appeal. Here we have two roads, not of the same kind or on the same level. One is wholly an underground or elevated road for through travel, reaching far into the country and with no surface grade until the city boundary is passed, while the other is an ordinary street railroad, built on the surface, for local traffic within the limits of the city. Each road is an independent entity, existing by itself, operated by its own method, with its own tracks, signals and appliances, which are used exclusively by itself. · Each may be separately owned, sold, mortgaged and managed. · Neither has any physical connection with the other. Annihilate either and the other continues to exist in the same condition as before, with every power and capacity unimpaired. Neither trains nor cars can be transferred from one to the other. They need not be of the same gauge, although doubtless they are. A surface railroad is separate and distinct

from an underground or overhead railroad, even when directly over one or under the other. Neither is a part of the other, but each is an entirety in itself. The subject is so controlled by perception and cognition as to make rules of logic difficult of application. Describe the roads, and two different things appear before the mind, as distinct as the right hand from the left ; the one a surface railroad and the other an underground or overhead railroad, and neither belonging to or connected with the other. We think that the effect of the two statutes was to authorize two roads in Atlantic avenue where only one existed before, and the last to be constructed as a street railroad, to which the Constitution so pointedly applies." (PP. 443–447.)

To the average legal mind there would seem to be no difficulty in gathering from the foregoing quotation a definite comprehension of the extent and effect of our decision in *Matter of Long Island Railroad.* No more conclusive illustration of the rule *stare decisis* could possibly be presented The identical question now before us was necessarily decided in that case. With that statement we might well end the discussion. But the magnitude of the interests involved, and the variety of the subsidiary questions raised have created a complex and voluminous controversy, in the judicial discussion of which it has been impossible to give equal emphasis and importance to all its parts. That circumstance has given the zealous counsel for the plaintiffs the opportunity to urge, with characteristic force and ability, that in our former decision we overlooked or misapprehended certain vital considerations, which are now more clearly presented, and which should lead to a different conclusion.

It is true, for instance, that the report of the commissioners appointed under the statute of 1896 was not as fully presented or discussed in the former case as it has been upon the present appeal. That report contained a proposition to " operate a line of railway by the trolley system *on the surface of the streets*, thus replacing the existing ' rapid transit' trains by much more convenient and efficient service for short distance riders, while at the same time it will distribute the passengers

on the through trains to points intermediate between stations, and the through trains will be enabled to give true rapid transit by reason of few stoppages. The motive power of *both systems* will be electricity. The through service by short trains at frequent intervals and high speed will give accommodation never before offered." It is equally true that this particular passage of the report was not specifically emphasized in our former opinion. The reason for that is obvious. We then looked, as we must now look, to the statutes of 1897 and 1899, for the extent and the limitations of the rights of the railroad companies in Atlantic avenue. The statute of 1897, which was a special law designed to fix these rights, will be scrutinized in vain for even a hint or suggestion that the plaintiffs or either of them were to have the right to put down a new railroad upon the very surface from which their existing railroad was to be removed. We are controlled by the statute, not by the recommendations of the commissioners which were not carried into the law. It is to be noted, moreover, that the recommendation of the commissioners is judiciously conservative and general. It contains no suggestion that the proposed trolley system shall be operated by the plaintiffs; nor that any agency through which it shall be operated may dispense with the legal formalities prescribed by the Constitution; nor even that the tracks for the trolley system shall be laid upon the surface over or under the tracks of the plaintiffs, for the language of the report is " on the surface of the streets." For aught we know the commissioners may have had in view the organization of a street railroad corporation, which might or might not be composed of the stockholders of the plaintiffs, but which, in any event, would be a separate legal entity, subject, both in its incorporation and operation, to the provisions of the Constitution and the statutes relating to street railroads. Whatever their plan may have been, it found no fruition in the statute of 1897.

When we turn to the general statute of 1899, which was fully discussed in our former opinion and upon which the plaintiffs rely on this appeal, we find in its provisions intrinsic

evidences of an attempt to accomplish what the Constitution forbids. Its apparent purpose was to anticipate, so far as possible, the difficulty of adding one kind of a railroad to another kind and still counting the two as one. Counsel now argues that in *Matter of Long Island Railroad Company* we overlooked or misapprehended the fact that the statute of 1899 " authorizes the construction and operation of steam railroad tracks, and of steam railroad tracks only, on the surface of the right of way of a steam railroad corporation whose tracks or grade are required by law to be elevated or depressed ; and that such general act of 1899 does not authorize nor purport to authorize the construction or operation of street railroad tracks on the surface of such right of way ; and that therefore said act of 1899 does not violate the provision of the state constitution that ' no law shall authorize the construction or operation of a street railroad except upon the condition ' that the consents of local authorities and of abutting owners shall be first obtained."

That this point was neither overlooked nor misapprehended is clearly shown by the opinion of Judge VANN, for upon that phase of the subject he said : " The Constitution provides that the legislature shall not pass a private or local bill ' granting to any corporation, association or individual the right to lay down railroad tracks ' or ' granting to any private corporation, association or individual any exclusive privilege, immunity or franchise whatever.' The legislature, however, may ' pass general laws providing for ' these cases and for all others ' which in its judgment may be provided by general laws.' The power even to pass general laws relating to the cases named is subject to the limitation that ' no law shall authorize the construction or operation of a street railroad except upon the condition that the consent of the owners of one-half in value of the property bounded on, and the consent also of the local authorities having the control of, that portion of a street or highway upon which it is proposed to construct or operate such railroad, be first obtained, or in case the consent of such property owners cannot be obtained, the

Appellate Division of the Supreme Court in the department in which it is proposed to be constructed, may, upon application, appoint three commissioners who shall determine, after a hearing of all parties interested, whether such railroad ought to be constructed or operated, and their determination, confirmed .by the court, may be taken in lieu of the consent of the property owners." (189 N. Y. 444.)

But, waiving the fact that the question has been decided and considering it as an open one, there can be but one conclusion. If the trolley system proposed by the commissioners and for which the plaintiffs have laid tracks, was simply to be a part of the original railroad, why was it necessary to pass a general law? For that purpose, the insertion of a few appropriate words in the special act of 1897 would have been sufficient. There was, of course, the obstacle presented by the constitutional provision that the legislature shall not pass any private or local bill granting to any corporation, etc., the right to lay down railroad tracks. But why should that be regarded as an obstacle if it was the purpose of the plaintiffs to merely substitute, as their counsel now argues, one kind of rails for another but for the same purpose? Why did the special law of 1897 say " remove " if the legislature meant " exchange ? " Does not this line of argument lead to inevitable absurdities which clearly reveal the necessity for a general law? Was not this proposed trolley line, this " feeder " to the established railroad, regarded as a surface street railroad? And, finally, was not the statute of 1899 intended to secure by legislation for the plaintiffs a right which they can only obtain by getting the consents provided for in the Constitution? The obvious answers to these inquiries are, it seems to us, easily to be found in a close analysis of the statute. It provides that " whenever the right of way, grade or tracks of any steam railroad company in or adjacent to any street or highway in any city of the first class are required by law to be changed or altered by elevating or depressing the same for the purpose of discontinuing the use of steam power upon the surface of

such highway or street, such alteration or change of grade shall
not be deemed to curtail or affect any right which such railroad
company, or its lessees or assigns, may have to maintain and
operate a surface passenger railway within the limits of the right
of way so depressed or elevated, and over and under the rail-
road tracks so depressed or elevated, with all turnouts, sidings
and tracks necessary to secure the continuous connection and
operation of such surface railroad." This skillful language
reduced to simple English means that although the legislature
has ordained that a railroad corporation shall elevate or depress
its tracks so as to remove them from the surface of a street, it
may, nevertheless, use that same surface for another set of
tracks. But this is not yet the full height of paradox. The
statute provides that " such alteration or change of grade shall
not be deemed to curtail or affect any right which such rail-
road company or its lessees or assigns may have to maintain
and operate a surface passenger railway within the limits of
the right of way so depressed or elevated." If we apply that
language to the plaintiffs, is it not pertinent to ask, what
right had they to maintain and operate a surface passenger
railway within the limits of the right of way upon which their
tracks were elevated and depressed by command of the legis-
lature? The plaintiffs have anticipated this question by
suggesting in their argument (1) that the Nassau Electric
Railroad Company never consented to the changes made under
the act of 1897, and (2) that such changes were not actually
made until after the act of 1899 had been passed. In *Matter
of Long Island Railroad Company* we held, and we now
hold, that both of the plaintiffs did consent to the changes
made under the act of 1897; but even if they had not consented
in terms, they had bound themselves by accepting charters
under laws which expressly reserved to the legislature the
right to alter, modify or repeal. (L. 1832, ch. 256; L. 1834,
ch. 178; L. 1836, ch. 94.) Even more specifically is this
power reserved in chapter 187 of the Laws of 1876, under
which the Long Island Railroad Company and the Atlantic
Avenue Railroad Company, which was the immediate prede-

cessor in title of the Nassau Electric Railroad Company, were authorized to run cars "over said railroad, upon Atlantic avenue from the city line of Brooklyn to Flatbush avenue," subject, however, to the power of the legislature "at any time, to alter, modify or repeal this act; and all leases and contracts for the use of said avenue, shall be subject to such modifications or alterations in said avenue, and improvement thereof as the legislature may prescribe."

As to the contention of the plaintiffs that they are entitled to the benefit of the act of 1899, because the changes under the act of 1897 were commenced and completed after the act of 1899 was passed and while it was in force, we need only say that this latter statute, if intended to authorize the construction and operation of a surface street railway, was in violation of the constitutional provision above referred to, and if, as counsel for plaintiffs now contends, it was designed to permit the construction and operation of a surface railroad as distinguished from a street railroad, its general provisions must yield to the explicit commands of the special statute of 1897, with which it conflicts. The fact that the act of 1899 was repealed in 1908, when as the plaintiffs now contend their rights had become established, indicates the legislative intent to clear the murky atmosphere by removing from the statute books a law which was either so ambiguous as to mean nothing, or was so directly repugnant to the Constitution and to other statutes as to render it a nullity upon its face. All this applies as forcibly to that piece of road extending from Stone avenue to Atkins avenue as it does to the rest of the road, and it is immaterial, for the purposes of this discussion, whether the plaintiffs still have, as they claim, a title in fee to the thirty-foot strip from Stone avenue to Atlantic avenue.

These views logically lead to the conclusion that the demurrer was properly sustained, because the facts set forth in the complaint do not constitute a cause of action, and that final judgment was correctly ordered therein, for the facts are matters of record which cannot be changed by an amendment of the pleading. As to that part of the plaintiffs' prayer for

relief which asks for an adjudication of the title of the respective plaintiffs, we may add, in conclusion, that the opinion in *Matter of Long Island Railroad Company* (*supra*), no less than the views here expressed, seems to define, as accurately as the scope of the controversy will permit, the nature and extent of the plaintiffs' rights in Atlantic avenue. It would be impossible to go into that subject more specifically without discussing some questions that are not before us, and which may never arise.

The order of the Appellate Division affirming the final judgment entered upon the order of the Special Term should be affirmed, with costs.

CULLEN, Ch. J., GRAY, VANN, HAIGHT and CHASE, JJ., concur; WILLARD BARTLETT, J., absent.

Ordered affirmed.